***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gillen. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gillen with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and this is the court of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or non-joinder of the parties. *Page 2 
3. On plaintiff's date of injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. The Raleigh Housing Authority is self-insured, with NCHARRP as its servicing agent.
6. Plaintiff's date of injury is August 8, 2003. Defendant accepted plaintiff's right trigger thumb and mild carpal tunnel syndrome conditions as compensable and have since paid both medical and indemnity benefits related thereto.
7. The following were received into evidence by the Deputy Commissioner as stipulated exhibits:
 a. The parties' Pre-Trial Agreement, marked as stipulated exhibit 1.
 b. Plaintiff's medical records, tabbed 1-31 and marked as stipulated exhibit 2.
 c. Plaintiff's vocational records, collectively paginated 1-52 and marked as stipulated exhibit 3.
 d. Industrial Commission forms in this matter, marked as stipulated exhibit 4.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 53 years old and continued to work full-time for defendant-employer as a work order clerk. *Page 3 
2. Plaintiff was hired by defendant as a work order clerk in 1997. Her job duties in this position include answering the phone, retrieving messages from an answering machine, operating a two-way radio, as well as printing, sorting, and filing work orders into the mailboxes of maintenance personnel. Plaintiff did some data entry wherein she would input information received as to repairs needed for the Raleigh Housing Authority units into a computer program that provided a template. Plaintiff entered small bits of information into indicated spaces within that template.
3. Plaintiff began to suffer from symptoms to her right thumb and, subsequently, to both of her hands in August 2003. In March 2004, plaintiff was referred to Dr. George Edwards, a hand specialist. Plaintiff's workers' compensation claim for these conditions was accepted as compensable via a Form 60. On March 10, 2004 Dr. Edwards diagnosed plaintiff's bilateral carpal tunnel syndrome as "mild" and not requiring surgery, but recommended surgery for the right trigger thumb. Plaintiff's trigger thumb release surgery was authorized and performed by Dr. Edwards on March 16, 2004. Defendant paid temporary total disability benefits for the period she was out of work subsequent to this surgery. Dr. Edwards evaluated plaintiff several times after this surgery before releasing plaintiff to return to work without restrictions on April 28, 2004. Plaintiff returned to work for defendant at full duty soon thereafter.
4. On June 17, 2004 Dr. Edwards saw plaintiff for another follow-up appointment and described plaintiff in his notes as doing "quite well . . . has excellent [range of motion]." Furthermore, Dr. Edwards renewed plaintiff's release without restrictions and evaluated plaintiff to have reached maximum medical improvement (MMI) with a 3% permanent partial disability to her right hand. On this date Dr. Edwards also found that her left hand had "improved," writing: "there is no rating on this side and no restrictions." *Page 4 
5. Dr. Darrell was plaintiff's longtime family doctor. Dr. Darrell's medical notes and testimony reflect that, prior to August 2003, plaintiff had multiple other chronic medical and psychiatric conditions, unrelated to any hand problems, for which she received regular treatment and medication.
6. Those pre-existing, chronic medical conditions included, among other ailments, migraine headaches, neck pain, shoulder pain, hip pain, and fibromyalgia. The stipulated medical records reflect that plaintiff, in the 10 years prior to her hand problems of August 2003, had been treated by her primary care physician, five different orthopedists at Raleigh Orthopaedic Clinic, Urgent Care, multiple headache/pain management specialists, and a neurologist. Plaintiff was treated for these various ailments using multiple medications (including narcotics and antidepressants), trigger point injections, physical therapy, and epidural steroid injections.
7. Plaintiff claims that her compensable hand condition caused her numerous other chronic medical conditions to become aggravated or exacerbated. Plaintiff also alleges that she suffers from depression as a result of the hand condition. Plaintiff admitted during testimony at the hearing that she was trying to relate all of her long-standing health problems to her compensable hand condition.
8. Plaintiff testified at the hearing that she had never been diagnosed with a mental health condition. The medical records and Dr. Darrell's deposition testimony, however, reveal that plaintiff was prescribed and took antidepressant medications for years prior to August 2003.
9. Plaintiff started treating with Dr. Charles Matthews at the North Carolina Comprehensive Headache Clinic upon referral from Dr. Darrell prior to August 2003. Dr. Matthews began prescribing plaintiff's medications and at various times prescribed multiple *Page 5 
medications at a time, including narcotics and antidepressants. Plaintiff exhibited drug-seeking behavior with Dr. Darrell and other doctors during this claim.
10. Plaintiff began treatment with the Rex Healthcare Pain Clinic in January 2003, where she treated with multiple physicians for neck pain, depression, migraines, low back pain, right leg pain, asthma, and shoulder pain. Dr. Thomas Buchheit, at the Pain Clinic, began treating plaintiff in July 2003.
11. Dr. Buchheit testified that he first saw plaintiff on July 31, 2003. At that time and continuously thereafter he has intermittently treated her for neck pain, low back pain, right leg pain, shoulder pain, fibromyalgia, stress and anxiety, as well as for her hand and arm pain. Dr. Buchheit testified that when he first saw plaintiff she was already taking seven medications, including Methadone. Dr. Buchheit subsequently diagnosed her as having cervical post-laminectomy pain, chronic narcotic use, and tension headaches.
12. On August 10, 2004 plaintiff was confronted by Dr. Buchheit with the fact that the urine test taken at her June 2004 appointment was positive for marijuana and for Vicodin, a narcotic that he had not prescribed. Plaintiff was very tearful and crying. Following this episode, plaintiff was referred for an emergency appointment with Dr. Steven Prakken, a psychiatrist.
13. Plaintiff reported to Dr. Prakken that part of her psychological problems were caused by an unsupportive workplace and fear that she would lose her job. However, plaintiff testified that she had never voiced those complaints to her employer nor had she availed herself of any of the various avenues in which she could have reported perceived problems. Furthermore, plaintiff's superior, Barbara Taylor, testified at the hearing that although plaintiff had numerous ways to complain about her job including periods for commentary following her *Page 6 
evaluations and an established grievance process, plaintiff never complained of or reported any work environment issues. Ms. Taylor also testified that plaintiff's job had never been in jeopardy and that defendant had been very supportive in allowing her time off for doctors' appointments. Not only had plaintiff taken significant numbers of days off in the years leading up to this claim, but she was also allowed "comp time" in which she was allowed to work outside of her normal work schedule in order to take other periods of time off.
14. While Dr. Buchheit testified that plaintiff's hand condition had contributed to her chronic health problems, he also testified that he did not observe any objective findings that substantiated plaintiff's neck pain, back pain, hip pain, or headaches.
15. Dr. Darrell, plaintiff's long-time family doctor, when asked during his deposition if plaintiff's hand condition significantly contributed to the development of her chronic pain situation, testified: "that's real difficult to say because she's had pain for such a long time." Dr. Darrell further testified he had become concerned with plaintiff's drug-seeking behavior.
16. Dr. Krakauer testified that plaintiff's hand condition had contributed to her chronic health problems; however, he also testified that he did not know details regarding plaintiff's symptoms or treatment for plaintiff's chronic pain condition over the preceding 12 years. Dr. Krakauer also noted that he would defer to the doctors who treated her for those conditions. Dr. Krakauer further deferred to those doctors for any opinions regarding referrals for psychological treatment.
17. Dr. Prakken testified that plaintiff's pre-existing fibromyalgia, depression, anxiety, mental health issues, and back and arm pain had been exacerbated by her work injury. However, this opinion is based on two appointments totaling 120 minutes. Dr. Prakken had very little, if any, knowledge regarding plaintiff's chronic medical conditions. *Page 7 
18. Dr. Edwards testified that plaintiff's hand condition did not aggravate or exacerbate her preexisting chronic medical conditions, explaining: " . . . it's the reverse. The carpal tunnel and trigger thumb should not aggravate her other problems but . . . if she has all of these other musculoskeletal and mental problems, they can tend to exacerbate her symptoms of carpal tunnel and trigger thumb."
19. Having considered the medical records and testimony of Drs. Edwards, Krakauer, Prakken, Buchheit, and Darrell along with their relative expertise and experience, as well as the circumstances of their involvement with plaintiff's treatment, the Full Commission gives greater weight to the testimony and expert opinions of Dr. Edwards, who surgically treated plaintiff's hand condition, and to those of Dr. Darrell, plaintiff's longstanding family physician.
20. On June 17, 2004 Dr. Edwards assigned plaintiff a 3% permanent impairment rating to her hand. This rating provides for 6 weeks of compensation.
21. The Full Commission finds that plaintiff's testimony regarding her complaints and aggravation of her pre-existing conditions is not credible.
22. Plaintiff has produced insufficient lay and medical evidence to prove by the greater weight that plaintiff's compensable hand condition caused, exacerbated, or aggravated her pre-existing fibromyalgia, depression, anxiety, mental health issues, back pain, arm pain, or her other various health problems.
23. In this case, the Forms 22 submitted, together with the greater weight of the evidence regarding plaintiff's earnings, reflect in an average weekly wage of $704.40, which results in a workers' compensation rate of $469.62. *Page 8 
24. There is insufficient evidence of record to prove by the greater weight that defendant filed the Form 60 in this matter as a result of an error due to fraud, misrepresentation, undue influence, or mutual mistake.
25. All issues in this matter were brought and defended reasonably and with reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In or around August 2003 plaintiff developed an occupational disease resulting in right trigger thumb and mild, nonoperative bilateral carpal tunnel syndrome. Defendant accepted these conditions as compensable. N.C. Gen. Stat. § 97-2.
2. As a result of the compensable occupational disease, plaintiff was temporarily totally disabled from March 16, 2004 through April 28, 2004. Plaintiff is entitled to temporary total disability compensation at a rate of $469.62 per week for the period from March 16, 2004 until April 28, 2004. On April 28, 2004 plaintiff was released to return to work at full duty without restrictions, and thereafter returned to work at full duty with defendant. N.C. Gen. Stat. § 97-29. According to stipulation of the parties, this temporary total disability compensation has been paid to plaintiff.
3. Given plaintiff's release to return to work without restrictions on April 28, 2004, as well as her actual return to work at full duty, defendant may terminate plaintiff's temporary total disability compensation as of that date. In re: Harrington v. Adams-RobinsonEnterprises, 128 N.C. App. 496, rev'd, 349 N.C. 218 (1998). *Page 9 
4. As a result of her compensable conditions, plaintiff has a 3% permanent partial disability of her right hand, for which plaintiff is entitled to compensation at the rate of $469.62 for a period of 6 weeks, for a total of $2,817.72. N.C. Gen. Stat. § 97-31(12).
5. In this case plaintiff has produced insufficient evidence to prove by the greater weight of the evidence that plaintiff's compensable hand condition caused, exacerbated, or aggravated her pre-existing fibromyalgia, depression, anxiety, mental health issues, back pain, arm pain, or her other various chronic health problems. Accordingly, plaintiff is not entitled to any benefits or medical treatment related to her fibromyalgia, depression, anxiety, mental health issues, back pain, arm pain, or her other various chronic health problems. Holly v.ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory Bus.Furn., 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000); Hodgin v.Hodgin, 159 N.C. App. 635, 583 S.E.2d 362 (2003).
6. In this case, the Forms 22 submitted, together with the greater weight of the evidence regarding plaintiff's earnings, results in an average weekly wage of $704.40, which results in a workers' compensation rate of $469.62. N.C. Gen. Stat. § 97-2(5).
7. Plaintiff is entitled to have defendant pay all medical expenses incurred or to be incurred as a result of the compensable hand condition. N.C. Gen. Stat. § 97-25. According to stipulation of the parties, these medical expenses, to date, have been paid.
8. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground. N.C. Gen. Stat. § 97-88.1
9. There is insufficient evidence to set aside the Form 60 filed in this case. N.C. Gen. Stat. § 97-17(a).
 *********** *Page 10 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. To the extent that it has not been paid, defendant shall pay plaintiff temporary total disability compensation at a rate of $469.62 per week for the period from March 16, 2004 through April 28, 2004. Those unpaid amounts that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. For her 3% permanent partial rating to her right hand, subject to the attorney's fee approved below, defendant shall pay permanent partial disability benefits to plaintiff at a rate of $469.62 per week for a period of 6 weeks for a total of $2,817.72.
3. To the extent that they have not, defendant shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable hand condition.
4. Defendant is not responsible for plaintiff's medical treatment related to her fibromyalgia, depression, anxiety, mental health issues, back pain, arm pain, or her other various health problems.
5. Defendant's request to set aside the Form 60 in this matter must be, and hereby is DENIED.
6. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent of any lump sums due plaintiff shall be deducted and paid directly to plaintiff's counsel.
7. No attorney's fees under N.C. Gen. Stat. § 97-88.1 are appropriate to be awarded in this matter. *Page 11 
8. Defendant shall pay the costs.
This the __ day of June, 2007.
 S/_______________________ DANNY LEE MCDONALD COMMISSIONER
CONCURRING:
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________________ DIANNE C. SELLERS COMMISSIONER *Page 1